PINEAPPLE ORANGE CO., *et al.,* v. CHARLES W. WHITE.

152 So. 863.

Opinion Filed January 18, 1934.

Petition for Rehearing Denied March 7, 1934.

*Caraballo, Graham & Cosio, Sam Mathews* and *J. D. Moran,* for Appellants;

*Hilburn & Merryday and Thomas B. Dowda,* for Appellee.

BUFORD, J.—The appeal here is from an order denying motion to strike certain paragraphs of a second amended and supplemental bill of complaint and also denying motion to dismiss such amended and supplemental bill of complaint.

The bill was to coerce an accounting to the appellee for the proceeds from the sale of certain lands and other relief.

It appears from the allegations of the bill of complaint here under consideration, which will hereafter be called the bill of complaint, that in 1904 the title to the lands involved was vested in two corporations, but the appellee, White, was the owner of all the stock in the corporations and held the beneficial interest in the land. The corporations were mere conduits.. Between 1904 and 1908 one Williams and one Camp advanced certain monies to White and certain of the lands were conveyed to Williams as security for White's obligation to Williams and Camp. In 1908 a contract in

writing was entered into between White on the one part and Camp and Williams on the other. Under this agreement Camp and Williams agreed to organize a corporation. White was to convey to the corporation certain lands which included all of the lands previously transferred to Williams as security. Williams and Camp were to advance the monies necessary to clearing the lands embraced in the agreement from encumbrances, which advancements, together with the monies already advanced to White were estimated to total $41,000.00. If the total amount did not exceed $41,000.00 then White was to have one-third of the stock of the corporation free of indebtedness, and if the amount totaled more than $41,000.00 White was to be charged with the excess as an indebtedness due by him to Camp and Williams. The payment of this excess amount was to be secured by White's one-third of the stock in the corporation.

The parties carried out the contract and in doing so the total indebtedness of White became $48,000.00 instead of $41,000.00. White caused a deed to be made by the two corporations holding the legal title to Williams, and White joined in the deed as a grantor. The deed on its face shows that this conveyance was not intended to vest in Williams the legal title but was merely a stop in carrying out White's agreement to convey the property to the corporation which was to be organized under the terms of the contract.

Later, the lands having been cleared of encumbrances at the expense of White as above set forth, and the conditions of the contract having been met, White prepared a deed which was executed by Williams and wife and delivered the same to the corporation organized, as heretofore stated, under the name of Pineapple Orange Company conveying the said lands pursuant to the contract theretofore entered

into between the parties as above stated, and thereupon the stock in the corporation was issued, White's stock being held by Williams and Camp as security for the payment of the difference between $41,000.00 and $48,000.00 which had been found needful in the clearing of the title to the land.

In 1926 Pineapple Orange Company sold the land to Orange Lake Company.

Now, in short, the question involved is whether or not the deed from Williams and wife, who held the title merely for the purpose of conveying it to the corporation, conveyed the fee simple title to the corporation, or was merely a mortgage to secure the indebtedness of White to Williams and Camp in the sum of $41,000.00. The appellants contend that it was a deed absolute and that the allegations of the bill of complaint establish it as such, while the appellee contends that it was made and executed as a conveyance to secure the indebtedness of $41,000.00 and having once been a mortgage that it was always a mortgage.

Other questions are presented but it is not necessary to discuss such other questions in this opinion. It is sufficient to say that so far as those other questions are involved we find no error reflected in the orders appealed from.

To determine the controlling question in this case we must look to the contract and gather the intent of the parties at the time same was made. Mr. Pomeroy in his work on Equity Jurisprudence, 3rd Ed., Section 1195, says:

"Whether any particular transaction does thus amount to a mortgage or to a sale with a contract of repurchase, must, to a large extent, depend upon its own special circumstances; for the question finally turns, in all cases, upon the real intention of the parties as shown upon the face of the writings, or as disclosed by extrinsic evidence. A general criterion, however, has been established by an overwhelming con-

census of authorities, which furnishes a sufficient test in the great majority of cases; and whenever the application of this test still leaves a *doubt* the American courts, from obvious motives of policy, have generally leaned in favor of the mortgage. This criterion is the continued existence of a debt or liability between the parties, so that the conveyance is in reality intended as a security for the debt or indemnity against the liability. If there is an indebtedness or liability between the parties, either a debt existing prior to the conveyance, or a debt arising from a loan made at the time of the conveyance, or from any other cause, and this debt is still left subsisting, not being discharged or satisfied by the conveyance, but the grantor is regarded as still owing and bound to pay it at some future time, so that the payment stipulated for in the agreement to reconvey is in reality the payment of this existing debt, then the whole transaction amounts to a mortgage, whatever language the parties may have used, and whatever stipulations they may have inserted in the instruments. On the contrary, if no such relation whatsoever of debtor and creditor is left subsisting, then the transaction is not a mortgage, but a mere sale and contract of repurchase. The writings *may* show on their face that the relation of debtor and creditor still continues, and that its existence and consequences are contemplated by the parties; or they may entirely fail to show any such fact and may consist simply of an absolute conveyance and of a naked agreement to reconvey. While in the former case parol evidence is clearly inadmissible to contradict the terms of the writings, and to destroy their necessary character as a mortgage, in the latter case extrinsic parol evidence is always admissible to show the real situation of the parties, the existence of a debt, their intention to secure payment of that debt, and the actual

character of the instruments as constituting a mortgage."
See also Holmberg, *et al.,* v. Hardee, *et al.,* 90 Fla. 787, 108
Sou. 211.

. When we turn to the contract we find that this agreement
or memorandum recites in its opening paragraph, "Mem-
orandum of land and orange grove owned by C. W. White,
and outline of plan for putting them into orange grove
company to be formed by W. M. Camp, J. R. Williams and
White, and financed by them (C. and Williams) whereby
White may preserve the property, and pay off the remainder
of his creditors." Then follows a description of the lands
with a memorandum of the encumbrances. Then the agree-
ment recites:

. "I, White, must have cash to pay unsecured debts to
H. E. Taylor, Gainesville; H. G. Dunn, Citra; William
Hocker, Ocala; R. A. Burford, Ocala; S. R. Pyles, Ocala;
J. M. Graham, Gainesville; Massey and Nat. Bank St. of
Fla. judgment, all estimated, $10,200.00.

. "Balance to make $41,000.00 to White for personal uses.
Now Williams and Camp agree to furnish White at once a
credit, subject to his check, a sum which added to his present
debt to Williams, shall equal $41,000.00, and organize a
Company, and put W. J. Crosby on the Board and make
him an incorporator and Secretary, as White's nominee,
and besides the $41,000.00 issue to White one-third of the
capital stock of the Company free, provided he gets the said
land above named turned into the Company with the use
of the $41,000.00, but if not then he shall be given the
further sum required and be charged with it, and be given
time to repay it with 8% interest.

"Williams is to make White a direct personal loan suf-
ficient in addition to the above, to pay a debt of Mrs. E. O.
Brown on his Citra home, and take a deed from Mrs.

Brown to operate as a Mortgage to secure him ultimate payment, and will further, with Camp, loan White $5,000.00 on Colorado Mine Property.

"White can have one year from deeding of property to new Company when formed to decide if he will repay all money advanced to him, and take back his orange property being given two further years to pay it. Interest then to be 10% to date of his decision and 8% after that. Mules on White's property to go into new Company, but all his cattle and hogs to remain his personal private property. White is to turn over his abstracts to O. T. Green and do such things as are asked under Green's guidance to create merchantable titles, but without any charge to White for Green's advices, which Camp and Williams must pay. This is O. K. as a basis for further proceedings, and Camp and Williams are to furnish money from this time for working groves, White to have remainder of present season's crop.

"J. R. WILLIAMS,
"W. N. CAMP,
"O. T. GREEN                    CHAS. W. WHITE."

Then follows a second paragraph containing the following:

"Land designated in this paragraph, and terms outlined, are independent of those named in Par. No. 1, and White represents that besides land designated in Par. No. 1 as those to be put into a Company, he owns in his own name, or that of Consolidated Chittitu Company, the following:"

Then follows description of certain tracts of land designated as "A," "B," "C," "D," "E" and "F," and then follows the further memorandum:

"Except the land in 'F,' White is to find out the cost of clearing title, or getting the liens on the tracts 'A,' 'B,' 'C,' 'D,' and 'E.' Williams will examine each tract as to

value and if he believes its value warrants taking into Company to be formed, without diminishing White's stock interest, or taxing any lien on it, he shall furnish the money for clearing the title, in excess of $41,000.00 credit named in Par. 1, or give White credit for the money so used and charge him with cost subject to the repayment right named in Par. No. 1. Land named in 'F,' is to be a special class. If Camp and Williams conclude to take it over at all it must be on a basis of $1,000.00 flat credit to White, additional to the $41,000.00 named in Par. No. 1, and credits that arise if any under the sections 'A,' 'B,' 'C,' 'D,' and 'E' of Par. No. 2 and White shall not be held on any guarantees as to title of land of 'F'; Williams and Camp taking all speculative chances and risks of failure to get sufficient title."

Then follows a third paragraph, in which it is recited:

"It is stated, agreed and confirmed that in a contract signed and acknowledged by Williams, December 19th, 1907, he agreed to pay J. O. Matthews $12,000.00 for a deed to 30 acres of orange grove and 21½ acres with barn and residence in Section 5 and Section 6 of Tp. 13 S. R. 21 E. as per deed from Matthews to said Williams, dated November 23rd, 1907, and to carry White for an interest therein of one-half until White could reduce Williams' actual payments to Matthews to $6,000.00; also, that Williams paid Matthews $5,750.00, by acceptances on this date, and $750.00 previously to White on that account, making a total of $6,500.00, when drafts are paid, and wants White to consent for the property so bought from Matthews to go into the proposed Company; and it is agreed that it may go in, the $12,000.00 credit to White to be additional to the $41,000.00 credit established in Par. No. 1, and White to be charged with the $6,500.00 paid Matthews as of dates when paid,

without diminishing White's stock interest in Company, or fixing any charge on it, and subject to repayment and taking back of property under same conditions as apply to land in Par. No. 1."

Then a fourth paragraph contains the following:

"It is understood and stipulated that White retains absolutely as his own other property held by him in his own name, or that of Company's, uncommitted in any way on it to Camp and Williams, or proposed Company, to convey to them or either any part thereof, and neither of them acquire relationship to it. This paragraph being added to estop any claim that White is holding back any property or right in any, under this agreement. The property so withheld from the proposed Company and out of White's obligation to convey, or tender, being:"

Which is followed by description of plots of land designated as "H," "I," "J," "K" and "L," after which descriptions the following appears:

"This memorandum is consented to by us as a correct basis for our agreement in dealing with each over White's land, and as basis for Mr. O. T. Green's guidance in forming Company, and advising White in perfecting titles of land to be conveyed to new company, and for drawing a more formal contract for execution by the parties.

"Ocala, Florida, January 6th, 1908.

"W. N. CAMP,
"J. R. WILLIAMS,
CHAS. W. WHITE."

"O. T. GREEN

Then follows a fifth paragraph in language and figures, to-wit:

"White represents that he owns seventeen acres in N. E. corner of S. W. $\frac{1}{4}$, and five acres in N. E. corner of S. W.

¼ of S. W. ¼ Sec. 28, Township 12, Range 22, which he retains under statement in regard to paragraph No. 4.

"Also that of judgments against him:

| | | | |
|---|---|---|---|
| 1 to Garner | | about | 2,100 |
| 1 to Ocala Foundry | | " | 600 |
| 1 to Fishel | | " | 120 |
| 1 to Masters | | " | 700 |
| 1 to Montague | | " | 525 |
| 1 to Nugent | | " | 1,300 |
| 1 to Williams and Clark | | " | 600 |
| 1 to Hubbard and McD. | | " | 250 |
| 1 to Waterman | | " | 350 |

"Last four being garnishee judgments.

| | | | |
|---|---|---|---|
| 1 to Garner | | about | 5,000 |
| 1 to Kelly | | " | 4,000 |
| 1 to Anderson & Hocker | | " | 1,000 |

have all been paid by White, taken up and turned over to Williams on assignments to enhance White's credit in property when previous loans were made, showing that they were not debits and to enable Williams to cancel simultaneously.

"National Bank State of Florida, has hostile judgment, largely reduced, which White can take up for $175.00.

"Travelers Insurance Company has large one on Def. (decree). They bought the land for $5,000.00, sold it for about $25,000.00 and White thinks he can get the judgment settled for about $800.00.

"E. O. Brown has one, but she is to assign it with conveyance to the house when White pays the balance on house.

"Mrs. Orr has one for about $4,500.00. It is on a note secured by orange grove mortgage (½ Lot 9). She offered

to convey the mortgage and claims and judgment for $1,000.00 recently, but White could not meet the offer and it is off, but might be renewed by her.

"J. M. Graham, Gainesville, has one about $3,000.00. He is willing to take $1,000.00 cash and a new note, which White will do when the $41,000.00 is placed to his account (less his present debit to C. and W.).

"First National, Gainesville, has judgment for about $5,000.00 against White and Tropical Company. This is where White endorsed for Company and Bank. Mr. Graham says will take $1,000.00 and cancel; they having bought the grove, and will take new note for balance and turn over grove and credit White on note when it is sold. This must be for immediate acceptance. White can pay from $41,000.00 credit.

"First National Bank, Gainesville, has suit for $6,000.00, not yet in judgment. White can settle it for $1,000.00 and new note, if credit is given of balance $41,000.00 at once. Now, by letting White convey, and have Con Chittitu Company and Ock. Co. convey all property to new Company, or Trustee, Williams can release all mortgages held now, and Pas. Bank when White takes it up, and others as White takes up. Then little time, no expense and small worry will close it, and White, with cash proceeds received, and assets left can pay his remnant of creditors. Subject to approval of Mr. Green.

"Agreed to this:

"January 6, 1908,         "CHAS. W. WHITE.
"Copy rec'd                J. R. WILLIAMS,
"O. T. GREEN             W. N. CAMP."

Now, as we construe this memorandum of agreement, it was clearly the intention of the parties that the conveyances

made to the corporation were for the purpose of securing the payment of the pre-existing debt from White to Williams and Camp. It does not appear from this instrument that White took an option to re-purchase the property conveyed to the corporation. Under the terms of this agreement, White was to have one year in which to decide whether or not he would repay the obligation which he owed to Camp and Williams and, if he decided to repay that obligation, then he was to pay interest to the date of his decision at the rate of 10 per cent per annum and after that time was to pay 8 per cent interest per annum. It appears to us that this is conclusive against the contention that the debt was canceled upon the execution and delivery of the conveyance to the corporation. The debt, by terms of the agreement, not only continued to exist but the amount of interest to be paid thereon was especially stipulated.

The order appealed from should be affirmed. It is so ordered.

Affirmed.

DAVIS, C. J., and WHITFIELD and TERRELL, J. J., concur.

BROWN, J., dissents.

ELLIS, J., not participating.